1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

CASCADE YARNS, INC.,

8
9

Plaintiff/Counterclaim
Defendant,

10

v.

11

KNITTING FEVER, INC., et al.,

12
13

Defendants/Counterclaim
Plaintiffs/Third-Party
Plaintiffs,

14

v.

15

ROBERT DUNBABIN, SR., et al.,

16

Third-Party Defendants.

17

CASCADE YARNS, INC.,

Plaintiff,

18

v.

19
20

EMMEPIEFFE S.R.L., a foreign limited liability
corporation,

21

Defendant.

22

CASE NO. C10-861RSM

ORDER ON MOTION TO EXCLUDE
EXPERT REPORTS AND TESTIMONY
OF KENNETH D. LANGLEY

23        This matter is before the Court for consideration of defendants' motion to exclude the expert

24   reports and testimony of plaintiff's expert Kenneth D. Langley.  Dkt. # 738.  Defendants move to

25   exclude his testimony as unreliable, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509

26   U.S. 579 (1993).  Plaintiff has opposed the motion.  The Court deems it unnecessary to hear oral

27   argument, and for the reasons set forth shall grant the motion.

28    ORDER - 1

FACTUAL BACKGROUND

The background of this dispute is well known to the parties, and only the points relevant to this motion shall be summarized here.  Plaintiff Cascade Yarns, Inc., ("Cascade")  sells luxury yarns, some of them a blend of wool with other natural fibers, including kid mohair, silk, and cashmere.  The yarns, bearing the Cascade brand label, are sold through retail yarn shops and boutiques around the United States.  Defendant Knitting Fever, Inc., ("KFI")  is one of Cascade's chief competitors.  KFI is a distributor of a number of brands of luxury yarn, including the popular Debbie Bliss line.

Cascade alleges in the Fourth Amended Complaint that sometime between July 2000 and June 2001, Mr. Sion Elalouf, the controlling shareholder and chief executive of KFI, "discovered two versions of a yarn called Cashmerino—one of which contained cashmere and the one which did not contain any cashmere."  Fourth Amended Complaint ("FAC"), Dkt. # 322, ¶ 28.  Mr. Elalouf, with all his experience in the yarn trade, was "unable to distinguish between the cashmere and non-cashmere versions of the yarn."  *Id*., ¶ 29.  Indeed, apart from "expert fiber analysis—something to which the majority of KFI's and Cascade's customers do not have access—it is virtually impossible to confirm the presence of cashmere is [sic] a spun yarn."  *Id*.   According to the complaint, following this discovery of the two versions of Cashmerino, Mr. Elalouf entered into an agreement with defendant Designer Yarns, LTD., a British company, to "substitute the 0% cashmere verson of the product for the Cashmerino spun of 12% cashmere."  *Id*., ¶ 31.   The "0% cashmere" version was then marketed in a new line of Debbie Bliss yarns to be launched by Designer Yarns and distributed in the United States by KFI.  *Id*., ¶¶ 33-34.  The "non-cashmere" Cashmerino, with a label indicating the fiber content of 55% merino wool, 33% microfiber, and 12% cashmere,  was introduced to the market at the U.S. trade show in June 2001.  *Id.,* ¶¶ 35-39.

In 2006, Cascade "became aware of the extent of KFI's enormous success with its Cashmerino line of yarn products."  *Id*., ¶ 40.  Apparently suspicious of the accuracy of the label on the yarn, Cascade sent a sample of a KFI Cashmerino brand yarn to the Cashmere and Camel Hair Manufacturers Institute ("CCMI") for fiber content analysis.  *Id.*  CCMI sent the sample to K.D. Langley Fiber Services ("Langley") to conduct the testing.  On May 26, 2006, Langley "issued a report and concluded

ORDER - 2

that '[n]o cashmere fibers were observed.'" *Id*., ¶ 41.   The test results "showing that KFI's Cashmerino

yarn products did not contain any cashmere became known" at the National Needlework Association

trade show that took place June 10 through June 12, 2006. *Id*., ¶ 43.   Sion Elalouf, KFI's chief

executive, contacted Cascade's legal counsel concerning the test results soon after their industry release.

A series of communications followed between KFI, the other defendants, and Cascade representatives,

contesting the May 26 test report. *Id*., ¶¶ 44-47.   Specifically, "according to Mr. Elalouf, the type of

cashmere that KFI uses will not show up in fiber tests." *Id*., ¶ 44.   Counsel for KFI asserted that "fiber

tests for cashmere content in spun yarn are inherently unreliable," and included with his response copies

of test reports "purporting to show that Debbie Bliss Cashmerino yarns contained cashmere." *Id*., ¶ 47.

In September 2006, "amidst the growing controversy in the hand knitting yarn community,"

Debbie Bliss sent a letter to retailers who sold Cashmerino throughout the United States, "represent[ing]

that the Debbie Bliss branded yarns contain cashmere." *Id*., ¶ 53.[1]   In the meantime, a Pennsylvania

yarn retailer, The Knit With, sent samples of Debbie Bliss Cashmerino, Baby Cashmerino, and

Cashmerino Aran to Langley for further testing.   All three yarns are labeled as containing 12%

cashmere.   Langley reported on July 18, 2006, that "[n]o cashmere fibers were observed in any of the

samples." *Id*., ¶¶ 61-63; *Id.,* Exhibit A.   A separate July 25, 2006 quantitative analysis report by

Langley  described the content of the Cashmerino Aran as 57.2% wool and 43.8% acrylic, with "no

cashmere fibers [] observed in the sample." *Id*., Exhibit B.   The Knit With yarn shop also sent the same

three yarn samples to a different testing laboratory, Specialized Technological Resources, Inc.  This

laboratory examined the fibers by microscope and reported as to each that "there was no cashmere." *Id*.,

¶¶ 65-67; *Id*., Exhibit. C.

In April and May 2010, shortly before initiating this lawsuit, Cascade sent additional yarn

samples to Langley for fiber analysis.   The samples included both Cashmerino yarns and other luxury

yarns distributed by KFI, such as Louisa Harding Kashmir Aran, Noro Silk Garden, and others.

---

[1]A copy of this letter has been filed in conjunction with a separate motion in this matter.  Ms.
Bliss states in the letter that "stringent state of the art tests, including DNA," had confirmed the presence
of cashmere in the Cashmerino yarn.  Declaration of Joshua Slavitt, Dkt. # 765, Exhibit 4.

ORDER - 3

Langley found no cashmere at all in the Debbie Bliss Cashmerino Astrakan and Louisa Harding Kashmir Aran yarns, despite labels stating that each contained 10% cashmere. *Id.*, ¶¶ 70-71. Other yarns, according to Langley's analysis, contained cashmere, but in substantially lesser amounts than listed on KFI's labels. *Id.*, ¶¶ 72, 74-76, 78, 79-81. In subsequent tests, Langley found no cashmere in samples of Louisa Harding Kashmir Baby yarn, Debbie Bliss Cashmerino Chunky yarn, Debbie Bliss Baby Cashmerino, and another sample of Debbie Bliss Cashmerino Astrakan. *Id.*, ¶¶ 82-85. Additional 2010 fiber test results from Langley are detailed in the FAC at ¶¶ 86-95. These test results from the K.D. Langley lab led to the filing of the original and successive amended complaints, all alleging that KFI yarn is mislabeled as to fiber content, and that such mislabeling constitutes a fraud and a violation of the Lanham Act, 15 U.S.C. § 1125(a), as well as the Washington Consumer Protection Act, RCW 19.86.

In 2011, Cascade began sending samples of milk fiber yarns, such as Ella Rae Milky Soft, Knitting Fever Baby Milk, Ella Rae Latte, and others distributed by KFI, to Langley for fiber analysis. Langley found no milk protein in any of the yarns. *Id.*, ¶¶ 97, 99-101, 104. These tests on milk fiber yarn led to the filing of Cascade's Third and Fourth Amended Complaints, which incorporated allegations of mislabeling with respect to these yarns.

After extensive motion practice (the docket comprises at this moment 862 entries), this case is approaching the trial date. The parties have filed five separate motions for summary judgment, as well as numerous motions to exclude each others' experts. Only the motion to exclude the expert report and testimony of Kenneth Langley is ripe for consideration at this time. Because of the crucial role of Mr. Langley and K.D. Langley Fiber Services in the initiation and development of this case, the Court deems it necessary to rule on this motion before turning to the various summary judgment motions.

DISCUSSION

I. Legal Standard

Defendants bring this motion pursuant to Federal Rule of Evidence 702. This rule states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge,

ORDER - 4

1
2
> skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

3
4 FRE 702. Under this rule, expert testimony is admissible if it is both relevant and reliable.   In *Daubert*,

5 the Supreme Court charged trial courts with the task of acting as "gatekeepers" by deciding whether to

6 admit or exclude expert testimony under FRE 702.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

7 509 U.S. at  589 ("*Daubert I*"). The Court has an obligation to "ensure that any and all scientific

8 testimony . . . is not only relevant, but reliable."  *Id.*

9        FRE 702 permits a flexible, fact-specific inquiry that embodies the twin concerns of reliability

10 and helpfulness.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150-51 (1999).  The test for

11 helpfulness is essentially a relevancy inquiry.  *See Daubert I*, 509 U.S. at 591 ("Expert testimony which

12 does not relate to any issue in the case is not relevant and, ergo, nonhelpful" (internal quotation marks

13 omitted)).   As for reliability,

14
> *Daubert* provides a non-exclusive list of factors for determining whether expert testimony is sufficiently reliable to be admitted into evidence, including: (1) whether the scientific theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) whether there is a known or potential error rate, and (4) whether the theory or technique is generally accepted in the relevant scientific community.

15
16
17 *Mukhtar v. California State Univ., Hayward*, 299 F. 3d 1053, 1064 (9th Cir. 2002).   This list of factors

18 is intended to be "helpful, not definitive."  *Kumno Tire*, 526 U.S. at 151.

19
20        Although the Court's focus must be on principles and methodology and not on conclusions,

21 "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion

22 evidence which is connected to existing data only by the *ipse dixit* of the expert."  *General Electric Co.*

23 *v. Joiner*, 522 U.S. 136, 146 (1997).  "Conclusions and methodology are not entirely distinct from one

24 another."  *Id*.  The party proffering the evidence "must explain the expert's methodology and

25 demonstrate in some objectively verifiable way that the expert has both chosen a reliable scientific

26 method and followed it faithfully."  *Daubert Merrill Dow Pharmaceuticals, Inc.*, 43 F. 3d 1311, 1319 n.

27 11 (9th Cir. 1995) ("*Daubert II*").  To that end, the judge may inquire as to how often an expert's

28  ORDER - 5

1    experience-based methodology has produced erroneous results.  *Kumho Tire*, 526 U.S. at 151.

2         II.  Analysis

3         Plaintiff's expert on fiber analysis, Kenneth D. Langley, is the owner and operator of K.D.

4    Langley Fiber Services.  He is Chancellor Professor Emeritus of Bioengineering at the University of

5    Massachusetts Dartmouth, with an undergraduate Bachelor of Science degree conferred by that

6    institution in 1964, and a Master of Science degree conferred by the Institute of Textile Technology in

7    Charlottesville, Virginia in 1968.  Declaration of Robert Guite, Dkt. # 779, Exhibit A.  He began as an

8    assistant professor at the University of Massachusetts Dartmouth in 1968 and has taught courses since

9    that date, including courses in design and analysis of experiments, statistical methods, fiber technology,

10   microscopy, and process optimization.  *Id*.  He has numerous peer-reviewed conference publications, as

11   well as other publications.  *Id*.  He has attended and chaired numerous conferences and discussions in

12   the the textile industry, and has served on many committees, including the Cashmere and Camel Hair

13   Manufacturers Institute ("CCMI") Technical Advisory Committee in 1998.  *Id*.

14        Despite this extensive resume and list of publications, defendants have moved to exclude

15   Professor Langley's expert report and testimony as unreliable, both with respect to cashmere and other

16   animal fibers, and as to milk protein fibers.  The Court will address the two fiber types separately.

17        A.  Cashmere

18        Pursuant to the Wool Products Labeling Act,[2] a wool product may not be labeled as "cashmere"

19   unless it is the "fine (dehaired) undercoat fibers produced by a cashmere goat (capra hircus laniger)" and

20   "the average diameter of the fiber of such wool products" does not exceed 19 microns.  15 U.S.C. §

21   68a(6)(A), (B).  In addition, the wool product may not contain more than 3 percent by weight of

22   cashmere fibers with average diameters exceeding 30 microns.  15 U.S.C § 68a(6)(c).  In other words,

23   cashmere is defined both by the species of the animal and the average diameter of the individual fibers.

24        The American Association of Textile Chemists and Colorists ("AATCC") has developed

25   standardized test protocols for qualitative and quantitative analysis of textile fibers, designated Test

26   _____

27        [2]Reference is made to the Wool Products labeling Act for the purpose of definition only.

28   ORDER - 6

Method 20-2011 and 20A-2011 respectively.   The qualitative test is capable of distinguishing various types of animal-origin fibers, including alpaca, camel, cashmere, llama, mohair, wool, and yak, from one another.  Declaration of Joshua Slavitt, Dkt. # 739, Exhibit 3.  The test protocol requires equipment such as a compound microscope, slides, dissection needles, cross-sectioning device such as microtome or razor blade, melting point apparatus, micro-FTIR instrument for infrared spectroscopy, differential scanning calorimeter, and various reagents.   *Id.*  The test includes detailed observation of individual fibers under a microscope both in transverse section and elongated, including observation of the scales on animal fibers.  *Id*

The qualitative analysis procedure can determine relative amounts of natural fibers such as cotton, hair, hemp, linen, ramie, silk and wool in a blended fiber, but the AATCC protocol does not state that it can distinguish cashmere from other wool (such as sheep's wool).  *Id.*, Exhibit 2.  The required equipment includes an analytical balance capable of weighing down to 0.1 milligram, an oven desiccator, filters, flasks and weighing crucibles, microscope, fiber cutter, and various reagents.  *Id*.

Professor Langley operates K.D. Langley Fiber Services from his private, self-contained laboratory adjacent to his home.  Rule 26 Expert Report of Kenneth D,. Langley, Dkt. # 739, Exhibit 7.  He has conducted hundreds of tests in his laboratory, which has been "identified as an approved laboratory for purposes of the analysis of specialty animal fibers by CCMI.  *Id.*, ¶ 16.  He follows the AATCC 20 and 20A protocols for quantitative and qualitative analysis, using the latest iteration in each instance.  *Id.*, ¶¶ 21-22.  He is not familiar with the International Organization for Standardization ("ISO") or its standard for certification of laboratories, ISO 17025, and therefore has not been certified by that organization.  Deposition of Kenneth Langley, Dkt. # 739, Exhibit , p. 129.

Defendants have moved to exclude Professor Langley's report and testimony in the first instance because objectively verifiable tests indicate that his test results are not reliable.   Professor Langely participated in "round trials" conducted by CCMI in the years 2005, 2007, 2008, 2009-10, and 2011.  These are tests in which samples of blended animal hair fibers are tested by various laboratories.  The actual blend is known to CCMI so there is an objective standard.  The results, according to the 2007 president of CCMI, enable CCMI and the analytical communities "to better understand the current

ORDER - 7

issues of testing, analysis and fiber identification, emphasizing the importance of accuracy and reproducibility of analytical results among laboratories." Declaration of Joshua Slavitt, Dkt. # 739, Exhibit 10. Defendants have produced a chart of Professor Langley's results from all five rounds, as well as the results reported by all participants in the 2007 round. These results do not simply cast doubt over the reliability of the fiber analysis tests; they demonstrate a disturbing lack of accuracy and totally refute the reliability of the testing procedure.

The results, in chart form, were as follows (amounts of cashmere are highlighted for ease of comparison):

2005 Round Trial:

Sample 1: **80%** cashmere, 20 % wool.  Langley found **84%** cashmere, 16% wool.

Sample 2: **50%** cashmere, 50% wool.  Langley found 68% wool, **32%** cashmere.

Sample 3: **100%** cashmere, which was correctly identified.

Sample 4: 100% yak.  Langley found 60% yak, 35% wool, 3% camel, and 2% cashmere.

Sample 5: 100% yak, which was correctly identified.

Sample 6: 90% wool, **10%** cashmere.  Langley found 100% wool, **no** cashmere.

2007 Round Trial

Sample 1: **80%** cashmere, 20% yak.  Langley found 97.8% yak, **2.2%** cashmere.

Sample 2: **50%** each cashmere and dyed yak. Langley found 95.2% yak and **4.8%** cashmere.

Sample 3: **70%** cashmere, 30% fine wool.  Langley found 94.2% wool, **5.8%** cashmere.

Sample 4: **90%** cashmere, 10% optima wool.  Langley found **94.9%** cashmere, 5.1% wool.

Sample 5: **80%** cashmere, 20% Mohair (angora).  Langley found 100% "Cashgora."

2008 Round Trial

Sample 1: 100% cashmere, which was correctly identified.

Sample 2: 100% yak, which was correctly identified.

Sample 3: 85% wool, **15%** cashmere.  Langley found 90.1% wool, **9.9%** cashmere.

Sample 4: **50%** cashmere, 50% Chinese wool.  Langley found **73%** cashmere, 27% wool.

Sample 5: **50%** cashmere, 50% Chinese wool.  Langley found **64.3%** cashmere, 35.7% wool.

ORDER - 8

<u>2009-10 Round Trial</u>

Sample 1: 73% wool, **27%** cashmere.  Langley found 93.8% wool, **6.2%** cashmere.

Sample 2:  **93%** cashmere, 7% wool.  Langley found **74.7%** cashmere, 25.3% wool.

Sample 3:  100% cashmere, which was correctly identified.

Sample 4:  100% yak, which was correctly identified.

Sample 5:  65% wool, **35%** cashmere.  Langley found 100% wool and **no** cashmere.

<u>2011 Round Trial</u>

Sample 1: 79% wool, **21%** cashmere.  Langley found 92.9% wool, **7.1%** cashmere.

Sample 2: 100% yak, which was correctly determined.

Sample 3:  **60%** cashmere, 23% wool, 17% angora.  Langley found 43.1% wool, **45.1%** cashmere, and 11.8% angora.

Sample 4: 100 % cashmere, which was correctly determined.

Sample 5:  **75%** cashmere, 25% yak.  Langley found **100 %** cashmere.

Declaration of Joshua Slavitt, Dkt. # 739, Exhibit 9.  Thus, while the 100% cashmere and 100% yak fibers were correctly identified, Professor Langley's test results were off by a wide margin for every single blended yarn or fiber.  Most often, the amount of cashmere was significantly under-reported.  See Samples 1, 2, and 3 in the 2007 round trials, Sample 1 in the 2009-10 round trial, and Sample 1 in the 2011 trial.   In two instances, the Langley tests found no cashmere at all, where it was present at levels from 10% to 35%.  See  Sample 6 in the 2005 round trial, and Sample 5 in the 2009-10 round trial.   The fact that on occasion the cashmere content found by testing was greater than the actual amount does not serve in any way to validate the testing procedure; it was still objectively wrong.   Thus Professor Langley's methods have been objectively tested and have been found lacking in reliability under *Daubert*.

Nor do the results achieved by other laboratories in the round test increase confidence in the reliability of the tests in general.  Instead, they have the opposite effect.  Defendants have offered a chart showing the test results from forty testing laboratories in the 2007 round trials. Declaration of Joshua Slavitt, Dkt. # 739, Exhibit 10.   Of the 200 tests conducted (5 samples x 40 laboratories), only

ORDER - 9

29 tests were accurate within three percentage points of the actual value for the fibers (wool, cashmere, yak, and angora).   Looking specifically at Sample 3, which was 70% cashmere and 30% wool, only twelve laboratories of the forty reported values within three percentage points of the actual fiber content. Of the remaining tests, ten actually reversed the values, finding less cashmere than wool in the sample, and one test found no cashmere at all.  *Id.*  This was the sample in which Langley found only 4.8% cashmere, but two other labs also found low cashmere content of 12.5% and 13.11%, far less than the actual 70% present in the sample.  These figures suggest that accuracy and reliability of the test results are not an isolated problem with K.D. Langley Fiber Services; it appears to be industry-wide.

In opposing defendants' motion, Cascade argues in the first instance that Professor Langley's test results should be viewed as accurate because they comport with test results from other laboratories. Cascade must perform some statistical sleight of hand to support this assertion.  Referring specifically to eleven different tests performed by Langley on Debbie Bliss Cashmerino Aran, Cascade argues that the eleven different values, which range from 0% cashmere in two samples up to 7% in one sample, should be averaged to reach a value of 3.45%.  Cascade's Opposition, Dkt. # 778, p. 3.  According to Cascade, this average value is "almost perfectly congruent" with the average value of 3.5% cashmere found in samples of this yarn by a different laboratory.  *Id.*  This reasoning is scientifically unsound; nowhere has Cascade provided any expert testimony to the effect that averaging a series of variable (and possibly inaccurate) values produces a single reliable value.   Moreover, as demonstrated above, the results achieved by other testing laboratories in the round tests are as variable in accuracy as Langley's, so comparing "averages" does nothing to bolster the reliability of either laboratory's results.

Next, Cascade contends that the round trials should not be used as a gauge of the reliability of the Langley test results because they are so difficult.   Cascade accuses defendants of "withholding from the Court the fact that the samples used in those trials are 'designed to be deliberately [more] difficult' than standard commercial samples in order to 'set a higher standard to the CCMI trials.'"  Cascade's Opposition, Dkt. # 778, p. 10.  Cascade cites for this proposition to the deposition of Liqin Zhang, who is not identified by Cascade but who is described by defendants as a representative of a different testing laboratory, not a representative of CCMI.  Liqin Zhang stated that "from my experience of being

ORDER - 10

participating [sic] in the CCMI trial, I noticed that their samples are more difficult from the commercial samples." Declaration of Robert Guite, Dkt. # 779, Exhibit G, p. 26.  When asked why the round trials would be more difficult, he responded, "Obviously they're trying to set a higher standard to the CCMi trials."  *Id*.  This statement is pure speculation on the part of this witness, who does not represent CCMI or speak for their policies.   As noted above, the purpose of the CCMI round trials, as stated by the 2007 president Karl Spilhaus, is to "understand the current issues of testing, analysis and fiber identification," with an emphasis on accuracy and reproducibility.  Declaration of Joshua Slavitt, Dkt. # 739, Exhibit 10.  So it is erroneous for Cascade to characterize as "fact" Liqin Zhang's speculative statements about the difficulty of the round trials.  The Court finds no basis for disregarding the round trials as a measure of reliability (or lack thereof) of the Langley laboratory's fiber test results.

Finally,  Cascade insists that Professor Langley's results must be accepted because he is well-respected as an expert and he followed the AATCC testing protocols.  Cascade's Opposition, Dkt. # 778, pp. 9 - 14.  This line of reasoning approaches the *ipse dixit* argument so thoroughly rejected by the Supreme Court.  *Joiner*, 522 U.S. at 146.   The Court has inquired "as to how often [the] expert's experience-based methodology has produced erroneous results" and has found the error rate far too high to be accepted as reliable.  *Kumho Tire*, 526 U.S. at 151.  It must therefore be excluded as inadmissible.

B. <u>Milk  Fiber Yarn</u>

Defendants ask to exclude Professor Langley's report and testimony on milk fiber yarns, on the basis that he is not qualified as an expert in this area.   His credentials describe him as an expert in the area of fine animal hair fibers, while milk protein fiber is a semi-synthetic product.  With respect to milk protein (casein) fibers, he stated in his deposition testimony, "I've done enough research on casein that I have some knowledge of it."  Deposition of Kenneth Langley, Dkt. # 779, Exhibit B, p. 57.  He also noted that milk protein fiber "seems to have disappeared" from the United States textile industry in the 1960's (which would be prior to his university studies in the textiles field).  *Id*., p. 74.  For this reason, the reference or "known" samples of milk fiber he had available for visual comparison to his test samples were from the university archives, and were over forty years old.  *Id*., pp. 78-79.

For the birefringence test, Professor Langley testified to using a fiber named Vicara as the

ORDER - 11

1   reference sample.   He found that the birefringence colors from the reference sample and the test

2   samples of defendants' milk fiber yarns were "totally opposite."   *Id*., pp. 80-81.  Defendants have

3   produced evidence that the Vicara reference sample was zein or corn protein, not milk protein, so that

4   the birefringence test result was inapplicable.  Declaration of Joshua Slavitt, Dkt. # 739, Exhibit 13.

5   Nowhere has Cascade addressed this assertion or attempted to rebut it; Cascade simply reports the

6   Professor's observation and asks the Court to accept it without question.  See, Cascade's Opposition,

7   Dkt. # 778, p. 11.  In light of defendants' evidence and argument regarding the reference samples, the

8   Court will not do so.

9          Even more problematic is defendants' contention that the testing protocol used by Professor

10  Langley (bleaching before analysis) stripped away the milk protein from the fiber before he tested it.

11  Nowhere has Cascade attempted to rebut this assertion or even address it.  On the other hand, defendants

12  have produced evidence in the form of an expert deposition that "the validated and useful technique for

13  determining whether or not Casein proteins are present" is micro FTIR.  Deposition of Maureen

14  Reitman, Dkt. # 850, Exhibit 1, p. 128.   She noted that Professor Langley did not use that technique,

15  and that the techniques he did apply "are not validated for distinguishing Casein presence in all forms

16  and in fibers [such as] the ones that we are looking at here."  *Id*.  The Court shall accordingly find that

17  Professor Langley is not qualified as an expert on the presence of milk fiber protein in yarn.

18                                              CONCLUSION

19          The Court, exercising its obligation as gatekeeper in this matter, finds that Professor Langley's

20  reports and testimony on cashmere and other animal fibers are based on test techniques which have been

21  demonstrated to be highly unreliable, and are therefore inadmissible.  Further, he is not qualified to

22  testify as an expert on milk fiber yarn.  Defendants' motion to exclude the expert reports and testimony

23  of Kenneth D. Langley is accordingly GRANTED pursuant to FRE 702 and *Daubert I*.

24          Dated this 18th day of October 2012.

25

26                                              _____

27                                              RICARDO S. MARTINEZ
                                                UNITED STATES DISTRICT JUDGE

28   ORDER - 12