1

2

3

4

5          UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON
6                  AT SEATTLE

7

8   CASCADE YARNS, INC.,                          CASE NO. C10-861RSM

9               Plaintiff/Counterclaim            ORDER ON CROSS-MOTIONS FOR
                Defendant,                        SUMMARY JUDGMENT
10
                 v.
11
    KNITTING FEVER, INC., et al.,
12
                Defendants/Counterclaim
13              Plaintiffs/Third-Party
                Plaintiffs,
14
                 v.
15
    ROBERT DUNBABIN, SR., et al.,
16
                Third-Party Defendants.
17  CASCADE YARNS, INC.,

18              Plaintiff,

19               v.

20  EMMEPIEFFE S.R.L., a foreign limited liability
    corporation,
21
                Defendant.
22

23

24
        This matter is before the Court for consideration of cross-motions for summary judgment.

25
    Plaintiff Cascade Yarns, Inc., ("Cascade") has filed a motion for summary judgment against all

26
    defendants on Counts I through IV of the Fourth Amended Complaint ("FAC")  and has requested oral

27

28   ORDER - 1

argument.  Dkt. # 724.  Defendants Knitting Fever, Inc. and KFI, Inc.,  (together, "KFI"), Sion Elalouf, and Designer Yarns, Ltd., move for summary judgment on all four counts.  Dkt. # 715.  By separate motion, defendants Debbie Bliss and Jay Opperman have also moved for summary judgment on all four counts.  Dkt. # 717.  The Court deems it unnecessary to hold oral argument on these motions.  For the reasons which are set forth below, plaintiff's motion shall be denied, and the defendants' motions shall both be granted.

FACTUAL BACKGROUND

The background of this dispute is well known to the parties, and need only be summarized here.  Plaintiff Cascade Yarns, Inc., ("Cascade")  sells luxury yarns, some of them a blend of wool with other natural fibers, including kid mohair, silk, and cashmere.  The yarns, bearing the Cascade brand label, are sold through retail yarn shops and boutiques around the United States.  Defendant Knitting Fever, Inc., ("KFI")  is one of Cascade's chief competitors.  KFI is a distributor of a number of brands of luxury yarn, including the popular Debbie Bliss line.

Cascade alleges in the Fourth Amended Complaint that sometime between July 2000 and June 2001, Mr. Sion Elalouf, the controlling shareholder and chief executive of KFI, "discovered two versions of a yarn called Cashmerino—one of which contained cashmere and the one which did not contain any cashmere."  Fourth Amended Complaint ("FAC"), Dkt. # 322, ¶ 28.  Mr. Elalouf, with all his experience in the yarn trade, was "unable to distinguish between the cashmere and non-cashmere versions of the yarn."  *Id*., ¶ 29.  Indeed, apart from "expert fiber analysis—something to which the majority of KFI's and Cascade's customers do not have access—it is virtually impossible to confirm the presence of cashmere is [sic] a spun yarn."  *Id*.  According to the complaint, following this discovery of the two versions of Cashmerino, Mr. Elalouf entered into an agreement with defendant Designer Yarns, Ltd., a British company, to "substitute the 0% cashmere version of the product for the Cashmerino spun of 12% cashmere."  *Id*., ¶ 31.   The "0% cashmere" version was then marketed in a new line of Debbie Bliss yarns to be launched by Designer Yarns and distributed in the United States by KFI.  *Id*., ¶¶ 33-34.  The "non-cashmere" Cashmerino, with a label indicating the fiber content of 55% merino wool, 33% microfiber, and 12% cashmere, was introduced to the market at U.S. trade show in June 2001.  *Id., ¶¶*

ORDER - 2

35-39.

In 2006, Cascade "became aware the extent of KFI's enormous success with its Cashmerino line of yarn products." *Id*., ¶ 40. Apparently suspicious of the accuracy of the label on the yarn, Cascade sent a sample of a KFI Cashmerino brand yarn to the Cashmere and Camel Hair Manufacturers Institute ("CCMI") for fiber content analysis. *Id.* CCMI sent the sample to K.D. Langley Fiber Services ("Langley") to conduct the testing. On May 26, 2006, Langley "issued a report and concluded that '[n]o cashmere fibers were observed.'" *Id*., ¶ 41. The test results "showing that KFI's Cashmerino yarn products did not contain any cashmere became known" at the National Needlework Association ("TNNA") trade show that took place June 10 through June 12, 2006.[1] *Id*., ¶ 43. Sion Elalouf, KFI's chief executive, contacted Cascade's legal counsel concerning the test results soon after their industry release. A series of communications followed between KFI, the other defendants, and Cascade representatives, contesting the May 26 test report. *Id*., ¶¶ 44-47. Specifically, "according to Mr. Elalouf, the type of cashmere that KFI uses will not show up in fiber tests." *Id*., ¶ 44. Counsel for KFI asserted that "fiber tests for cashmere content in spun yarn are inherently unreliable," and included with his response copies of test reports "purporting to show that Debbie Bliss Cashmerino yarns contained cashmere." *Id*., ¶ 47.

In September 2006, "amidst the growing controversy in the hand knitting yarn community," Debbie Bliss sent a letter to retailers who sold Cashmerino throughout the United States, "represent[ing] that the Debbie Bliss branded yarns contain cashmere." *Id*., ¶ 53.[2] In the meantime, a Pennsylvania yarn retailer, The Knit With, sent samples of Debbie Bliss Cashmerino, Baby Cashmerino, and Cashmerino Aran to Langley for further testing. All three yarns are labeled as containing 12% cashmere. Langley reported on July 18, 2006, that "[n]o cashmere fibers were observed in any of the

---

[1]In its motion for summary judgment, Cascade states that copies of the Langley test report, showing no cashmere in the submitted sample, were disseminated by an unidentified third party at the yarn industry trade show. Dkt. # 724, p. 4.

[2]A copy of this letter has been filed in conjunction with a separate motion in this matter. Ms. Bliss states in the letter that "stringent state of the art tests, including DNA," had confirmed the presence of cashmere in the Cashmerino yarn. Declaration of Joshua Slavitt, Dkt. # 765, Exhibit 4.

ORDER - 3

1   samples." *Id*., ¶¶ 61-63; *Id.,* Exhibit A.  A separate July 25, 2006 quantitative analysis report by

2   Langley  described the content of the Cashmerino Aran as 57.2% wool and 43.8% acrylic, with "no

3   cashmere fibers [] observed in the sample." *Id*., Exhibit B.  The Knit With, a Pennsylvania yarn shop,

4   also sent samples of the same three yarns to a different testing laboratory, Specialized Technological

5   Resources, Inc.  This laboratory examined the fibers by microscope and reported as to each that "there

6   was no cashmere." *Id*., ¶¶ 65-67; *Id*., Exhibit. C.

7        In April and May 2010, shortly before initiating this lawsuit, Cascade sent additional yarn

8   samples to Langley for fiber analysis.  The samples included both Cashmerino yarns and other luxury

9   yarns distributed by KFI, such as Louisa Harding Kashmir Aran, Noro Silk Garden, and others.  Langley

10   found no cashmere at all in the Debbie Bliss Cashmerino Astrakan and Louisa Harding Kashmir Aran

11   yarns, despite labels stating that each contained 10% cashmere.  *Id*., ¶¶ 70-71.  Other yarns, according to

12   Langley's analysis, contained cashmere, but in substantially lesser amounts than stated on KFI's labels.

13   *Id*., ¶¶ 72, 74-76, 78, 79-81.  In subsequent tests, Langley found no cashmere in samples of Louisa

14   Harding Kashmir Baby yarn, Debbie Bliss Cashmerino Chunky yarn, Debbie Bliss Baby Cashmerino,

15   and another sample of Debbie Bliss Cashmerino Astrakan.  *Id*., ¶¶ 82-85.  Additional 2010 fiber test

16   results from Langley are detailed in the FAC at ¶¶ 86-95.  These test results from the K.D. Langley lab

17   led to the filing of the original and successive amended complaints, all alleging that KFI yarn is

18   mislabeled as to fiber content, and that such mislabeling constitutes a fraud and a violation of the

19   Lanham Act, 15 U.S.C. § 1125(a),  as well as the Washington Consumer Protection Act, RCW 19.86.

20        In 2011, Cascade began sending samples of milk fiber yarns, such as Ella Rae Milky Soft,

21   Knitting Fever Baby Milk, Ella Rae Latte, and others distributed by KFI, to Langley for fiber analysis.

22   Langley found no milk protein any of the yarns.  *Id*., ¶¶ 97, 99-101, 104.  These tests on milk fiber yarn

23   led to the filing of Cascade's Third and Fourth Amended Complaints, which incorporated allegations of

24   mislabeling with respect to these yarns.

25        The Fourth Amended Complaint sets forth six separate causes of action, all arising from the

26   allegations of mislabeled yarn: Count I, unfair competition under the Lanham Act, 15 U.S.C. § 1125(a);

27   Count II, false advertising under the Lanham Act, 15 U.S.C. § 1125(a); Count III, unfair competition in

28    ORDER - 4

1   violation of the Washington Consumer Protection Act, RCW 19.86; Count IV, unfair competition at

2   common law; Count V, injury to business and property in violation of the Racketeer Influenced and

3   Corrupt Organization Act ("RICO"); and Count VI, conspiracy to cause injury to business and property

4   under RICO.  Both RICO claims have been dismissed.  Order, Dkt. # 701.  The parties have filed cross-

5   motions for summary judgment on the four remaining claims, as set forth above.  This Order will

6   address all three summary judgment motions.

7

8                                              DISCUSSION

9       **I.  Legal Standard**

10          Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to

11  any material fact and the movant is entitled to judgment as a matter of law."   Fed.R.Civ.P. 56(a).   An

12  issue is "genuine" if  "a reasonable jury could return a verdict for the nonmoving party" and a fact is

13  material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty*

14  *Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The evidence is viewed in the light most favorable to the non-

15  moving party.  *Id*.  However, "summary judgment should be granted where the nonmoving party fails to

16  offer evidence from which a reasonable jury could return a verdict in its favor." *Triton Energy Corp. v.*

17  *Square D Co.*, 68 F. 3d 1216, 1221 (9th Cir. 1995).  It should also be granted where there is a "complete

18  failure of proof concerning an essential element of the non-moving party's case." *Celotex Corp. v.*

19  *Catrett*, 477 U.S. 317, 323 (1986).  "The mere existence of a scintilla of evidence in support of the non-

20  moving party's position is not sufficient" to prevent summary judgment. *Triton Energy Corp.*, 68 F. 3d

21  at 1221.

22      **II.  Analysis**

23          As set forth in the FAC, this case originated with Cascade's suspicions regarding the proper

24  labeling of Debbie Bliss Cashmerino yarns as to cashmere content.  Cascade asserts that "the labels

25  profess that the yarns are made of either (1) 12% cashmere, 55% merino wool, and 33% acrylic fibers

26  or, alternatively, (2) 10% cashmere, 60% merino wool, and 30% acrylic fibers."   Cascade Motion for

27  Partial Summary Judgment, Dkt. # 724, p. 3.  Cascade believes these labels are false, and asserts that

28   ORDER - 5

[c]ontrary to these labels, however, fiber analysis completed in 2006 confirmed that these yarns did not contain the fiber composition set forth on their labels.  Guite Decl., Ex. C at 5:14-6:2 and Exhibit B, P at 286:25-288:7 and Exhibit 35, Exs. Q-S; Dkt. Nos. 4-2, 4-3, 4-4. The testing revealed that the yarns contained either no cashmere or, at best, up to half the cashmere represented on the label.  *Id.*  Cascade's expert's (Professor Emeritus Langley) analysis was consistent and also confirmed the absence of cashmere in the Accused yarns. Dkt. No. 152, ¶ 37, Exs. B, C; Guite Decl., Exs. DD at 8:13-18 & GG.

Of course, KFI already knew that its yarns lacked cashmere.  *See, e.g.*, Dkt. # 152; Guite Decl., Exs. D at 3:14-21; F at 3:10-17; G, L at 3:10-17, N at 3:2-5, P at 309:6-310:3, Q-S. KFI's own contemporaneous "Strategy Notes" confirmed that the yarns consistently tested as containing an average of 5% cashmere (not the labeled 12%) and a decision appeared to have been made to re-label the yarns as containing 5% cashmere and to advise customers of the issue.  Guite Decl., Exs. D at 4:3-11, F at 7:4-12, L at 9:1-9, V at 50:6-52:20 and Exhibit 6, 155-56 and Exhibit 15, HH. . . .

Cascade Motion, Dkt. # 724, p. 3-4.

The Court has reviewed Cascade's citations to the record for support of the contention that KFI's yarns are in fact mislabeled, as this is an essential element of Cascade's claims.  As noted above, the reports and testimony of Cascade's designated expert Kenneth D. Langley have been excluded as inadmissible for lack of reliability, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ("*Daubert*").  Dkt. # 865.   In order to prevail on any of its four remaining claims, Cascade must point to evidence in the record, independent of Professor Langley's test results, which would demonstrate that KFI's "accused yarns" are in fact mislabeled, and that KFI knew that to be so.

None of the evidence cited by Cascade fulfills that requirement.   Dkt. Nos. 4-2, 4-3, 4-4, and 152 are test reports and a declaration by Professor Langely, and have been excluded, as have Exhibits DD and GG to the Declaration of Robert Guite.  Turning to the exhibits attached to the Declaration of Robert Guite, Dkt. ## 726-27,[3] in the order cited, the Court notes that Exhibit C is a response to an interrogatory concerning Designer Yarn's test of Cascade's yarns, together with (at Exhibit B to the exhibit) a list of  some yarns; it constitutes no evidence at all regarding KFI's yarns.  Exhibit P is the deposition of Jay Opperman, and the cited pages discuss Exhibit 35, an e-mail from Nancy Blake of A.C. Moore.  In the e-mail, Ms. Blake explained that test results had confirmed that Cashmere Luxury

---

[3] Some exhibits were filed under seal at Dkt. # 728 and were stricken.  See Order, Dkt. # 854. These exhibits have been re-filed at Dkt. ## 856-57.

ORDER - 6

1   yarn was "not up to specifications" and must be returned to KFI as "unsaleable in our stores."  Dkt. #

2   856, Exhibit P, Exhibit 35.  The attached (and unsigned) test report from "SGS" of an unidentified yarn

3   is hearsay and cannot be deemed competent evidence of mislabeling of KFI's yarn.

4          Exhibit Q is described by counsel as "a true and correct copy of a chart prepared at my direction

5   compiling the reports of fiber analysis conducted by Kenneth D. Langley, Adam Varley and Maureen

6   Reitman.  All of the information summarized in Exhibit Q may be found in the reports to Kenneth D.

7   Langely, Adam Varley and Maureen Reitman that are also attached to this Declaration."  Declaration of

8   Robert Guite, Dkt. # 726, ¶ 18.  Adam Varley and Maureen Reitman are KFI's experts who performed

9   qualitative and quantitative analysis on the yarns at issue in this case.  Mr. Varley analyzed both

10  Cascade's and KFI's yarns; Ms. Reitman analyzed only KFI's milk fiber yarns.  Cascade has moved to

11  disqualify both of these experts, mainly on the basis of alleged chain of custody problems with the yarns

12  they tested.  Dkt. ## 840, 841.  It appears the motion to disqualify Mr. Varley may be motivated in part

13  by the fact that his analysis of Cascade's own cashmere blend yarn, Cash Vero, found lower values for

14  cashmere content than he found in various Cashmerino yarns.[4]  But Cascade cannot have it both ways,

15  accepting his opinions and test values on the KFI yarns and rejecting his opinions and test values on the

16  Cascade yarns.  Although the motion to disqualify these two experts is not yet ripe for a ruling, the

17  Court declines to recognize this exhibit as evidence confirming, as Cascade claims, that KFI's yarns did

18  not contain the fiber composition set forth on their labels.

19         Cascade also cites to Exhibit R, without any specific page citation, as support for its claim

20  regarding mislabeling.  Exhibit R comprises over 300 pages of test reports from SGS, which apparently

21  is a testing laboratory in the United Kingdom, although counsel's declaration does not explain the role

22  this laboratory plays in this case.  In these SGS test reports, most yarns are not identified other than by

23  the client's description, which in most cases states that it is "55% merino wool/33% microfibre/12%

24  _____

25         [4] According to the chart prepared by Cascade, for  the tested Cash Vero and Cash Vero DK yarns
    which are labeled as containing 12% cashmere, Mr. Varley found values of 13.76%, 5.93%, 5.95%,
26  7.81%, 8.43%, 8.06%, 6.25%, and 5.96%.  For the various Debbie Bliss Cashmerino yarns, also labeled
    as containing 12% cashmere, he reported values of 6.76%, 8.71%, 8.96%, 11.09%, and 10.04%.
27  Declaration of Robert Guite, Dkt. # 726, Exhibit Q.

28   ORDER - 7

1  cashmere." See, e.g., Dkt. # 726, Exhibit R, p. 21. This yarn content applies to Cascade's Cash Vero as

2  well as to some of the Debbie Bliss Cashmerino yarns, so these tests could refer to either one. A few

3  yarns are identified specifically as "Cashmerino Aran." Notably, these particular yarns tested at values

4  of 14.4%, 13.5%, 14.7%, and 13.1%. *Id.*, pp. 82, 85, 87, 89. These SGS test results appear to refute,

5  rather than support, Cascade's claims of mislabeling, at least with respect to Cashmerino Aran. With

6  respect to the other tests, in light of Cascade's failure to identify and connect the results with any

7  particular yarns, the Court cannot find in these test reports any evidence of mislabeling of any KFI yarn.

8         Moreover, in the absence of specific page citations within Exhibit R, the Court cannot sort

9  through the 300 pages to attempt to find what evidence Cascade actually seeks to offer with this exhibit.

10  Fed.R.Civ.P. 56(c)(1)(A). The same is true of Exhibit S, which appears to be a series of results from

11  tests performed on various yarns in 2006 by TFT, apparently another testing laboratory in the UK.

12  Although this exhibit is only eleven pages, Cascade has pointed to no particular page as presenting

13  evidence in support of its claim. While some tests report values for cashmere in Cashmerino Aran at

14  1.3% to 4.8%, there is one test of an unidentified yarn which reports 11.0% cashmere. The Court cannot

15  speculate as to what Cascade seeks to demonstrate by this exhibit. Further, no foundation has been laid

16  for this exhibit or for its authenticity, or for the reliability of this testing laboratory. The Court finds in it

17  no evidence to support for Cascade's claims of mislabeling.

18         Turning to the documents cited as support for the statement that "KFI already knew that its yarns

19  lacked cashmere," the Court notes once again that Dkt. No. 152, the Declaration of Kenneth D. Langley,

20  has been excluded. The cited pages at Exhibits D, F, and L are simply responses by defendants

21  Designer Yarn, KFI, Inc., and Knitting Fever, Inc., respectively, to Requests for Admission, in each case

22  denying the stated proposition. For example, KFI, Inc., was asked to

23         Admit that, following Wortman's review of fiber tests of your Cashmerino yarns, information
24         in your possession led you to believe on or around November 7, 2006 that the consensus of
           fiber tests on Cashmerino yarns revealed that those yarns contained 5% cashmere.

25  Declaration of Robert Guite, Dkt. # 726, Exhibit F, p. 3. In response, KFI responded,

26         Denied. KFI does not sell Cashmerino yarns. KFI admits only that certain fiber tests had
27         reported the cashmere content of samples of Cashmerino yarns to be approximately 5%,

28   ORDER - 8

but neither these reports nor other information in its possession led KFI to believe that those yarns had not been made with 12% cashmere.

*Id*.  The other two requests and responses are nearly identical.  None of these constitutes evidence as to what KFI knew or did not know regarding the actual content of Cashmerino yarns in November 2007. All the defendants admitted is that they knew of the test reports; they denied any belief that these tests revealed that the yarns actually contained only 5% cashmere.

Exhibit G, also cited by Cascade, is defendant KFI, Inc.'s responses to plaintiff's Second Requests for Admission.  Cascade has not cited to any particular response or page number as evidence supporting its contention regarding KFI's knowledge, and the Court declines to speculate as to what was intended by this citation to Exhibit G in its entirety.  Fed.R.Civ.P. 56(c)(1)(A).

The cited lines within Exhibit P, the deposition of Jay Opperman, present a colloquy regarding actions taken by a yarn shop owner:

Q: Do you recall her discussing with you or disclosing that she had a fiber analysis report stating that no cashmere was observed in the Luisa Harding Cashmere DK?

A: I don't recall that specifically.

Q: Do you have any general recollection of Ms. Podlesh['s] disclosure of fiber analysis reports?

A.  Yes, I had many conversations with her about the fiber composition, and her belief that there was an issue with the veracity of what was on the label, which led to her inability or reluctance to pay her bill.

Dkt. # 856, Exhibit P, p.p. 309-310.  Again, this cited evidence fails to support Cascade's contention that

KFI "knew" in late 2007 that its yarns "lacked cashmere."   Indeed, the continuation of the discussion rebuts that inference:

Q: If Ms. Podlesh had shown you the fiber analysis report that we've marked as Exhibit 42, would it have caused you to reevaluate or change your position regarding the accuracy of the fiber content of the Luisa Harding Cashmere DK?

A: No.

Q: Why not?

A:  Because I believe to this day that this is just a random report, and I believe that the product

ORDER - 9

you're talking about contains what was on the label.

*Id*.  See Fed.R.Civ.P. 56(c)(3).

The additional evidence cited by Cascade for its assertion that KFI knew its yarns lacked cashmere is Exhibits Q, R, and S.  The Court rejects these exhibits as evidence for the reasons stated above.

Turning to the evidence cited with respect to the "Strategy Notes," the Court can find no evidence that "confirms" as a fact that KFI's yarns contained an average of 5% cashmere,  as Cascade asserts.  The cited page at Exhibit D represents Requests for Admission posed to Designer Yarns.  This defendant was asked to admit that

> no later than November 4, 2006, you stated that "what to do about the many tons of Cashmerino yarns, out in retail outlets and warehouses, which we now know to be incorrectly labelled [sic]" was a "pressing issue."

Declaration of Robert Guite, Dkt. # 726, Exhibit D, p. 4.  Defendant responded,

> Designer Yarns denies that the Cashmerino yarns are incorrectly labeled.  This request appears to accurately quote from statements made in the document attached as Exhibit B, dated November 4, 2006, and labeled KFI010349.  The quoted statements were made at a time when Designer Yarn's investigation regarding the labeling of the Cashmerino yarns was still ongoing.  Having completed that investigation, the statements made in the quoted document are incorrect.

*Id*.  That is, Designer Yarns admitted to making the statement in the Strategy Notes and admitted it was accurately quoted, but did not admit that the statement itself was true as to the labeling.  Similarly, in Exhibit F, KFI was asked to admit to the authenticity of a copy of the Strategy Notes and did so.  *Id*. at Exhibit F, p. 7. There are no admitted facts regarding labeling or re-labeling in this cited section.  In Exhibit L, defendant KFI simply admitted that it had not formed any intention regarding disclosure of some unidentified document to its customers.  *Id*. at Exhibit L, p. 9.

Exhibit V, also cited by Cascade, is the deposition of Sion Elalouf.   In the first group of cited pages, he does discuss re-labeling, but the topic was designating the synthetic component of the yarn as microfiber versus acrylic, not the percentage of cashmere.  Dkt. # 857-2, Exhibit V, pp. 51-52.  In the second section cited, Mr. Elalouf addressed questions regarding fiber tests performed by Julie Smith.  He was asked if he had "any understanding as to why Julie Smith consistently got higher amounts of

ORDER - 10

cashmere than others?"  *Id.*, p. 156.  The response was simply that she "had been very highly

recommended" by the UK's biggest cashmere wholesaler, suggesting that her results may be more

reliable than others.  This section contains no evidence regarding labeling, mis-labeling, or re-labeling

of KFI's yarns.  The attached exhibit, Exhibit 6 to the deposition, is a memo from a Designer Yarn

representative to Mr. Elalouf which poses a series of questions and proposals based on test results from

SGS showing "a fibre content of 55% wool, 40% acrylic, 5% cashmere."  Dkt. # 857, Exhibit V, SE

Exhibit 6.  This memo does not constitute evidence that in fact the yarn under discussion actually

contained 5% cashmere;  it simply reflects discussion of a perceived problem, based on test results

which the participants at that time believed to be accurate.  In light of the general lack of reliability of

fiber tests noted in the Court's Order disqualifying Cascade's fiber test expert, these references to SGS

test results cannot be deemed evidence of mislabeling.  See, Order on Motion to Exclude Expert

Kenneth Langley, Dkt. # 865, p. 10.

In this respect, SE Exhibit 15, also cited by Cascade, is very interesting.  This exhibit is a copy

of a memo/discussion between Mr. Elalouf and Designer Yarn representatives.  Mr. Elalouf, writing in

capital letters, noted that Julie Smith identified cashmere not only by fiber diameter (19 microns or less)

but also by scale pattern, thereby increasing the accuracy of her results.  Following that is the statement

by another participant that

> We discussed testing in general and in particular the validity of results we have had from
> CCMI accredited labs, such as TFT and K.D. Langley.  Basically, whilst such tests serve a
> purpose in indicating the presence or lack of a particular fiber, they are not quantatively [sic]
> accurate enough to base labeling decisions on.  Franz recommends we focus on SGS and the
> DNA tests and simply forget the rest.  The only credible test is one where the synthetic fibre
> is chemically removed.

Dkt. # 857, SE Exhibit 15.  This statement simply underscores the uncertainty underlying all the testing

that was going on at this time.  While the statements in this memo were based on the assumption that the

SGS tests were more accurate than others, the reliability of SGS tests has not been put before the Court,

and defendants' statements based on their assumptions do not constitute evidence that the yarn actually

contained 5% cashmere instead of the labeled 12%.  The same reasoning applies to Mr. Elalouf's

Strategy Notes, which simply put forward a variety of options based on the assumption that the SGS test

ORDER - 11

1    results showing 5% cashmere were correct, while noting that some tests by other labs "came back with

2    as much as 13.1%."  Declaration of Robert Guite, Dkt. # 726, Exhibit HH, p. 2.

3           In further support of its claims based on mislabeling, Cascade cites to documents filed early in

4    this case in support of Cascade's motion for a preliminary injunction.  The documents were obtained

5    during discovery in a different case in the United States District Court for the Eastern District of

6    Pennsylvania, *The Knit With v. Knitting Fever, Inc., et al*, Cause No 2:08-CV-04221, and filed in that

7    case in support of summary judgment.[5]  Declaration of Robert Guite, Dkt. # 12, Exhibit A.   Based on

8    one document, Cascade asserts,

9           Indeed, KFI and its supplier corresponded openly regarding the lack of cashmere in KFI's
        yarns and KFI's supplier (Filatura Pettinata V.V.G. Di Stefano Vaccari & C. ("V.V.G.").
10       [V.V.G.] wrote to KFI to suggest "alternative" approaches to this product line.  *Id*., Ex. A
        at Ex. 11.  VVG recognized that the absence of cashmere in these lines could be "quite
11       dangerous" and suggested that KFI "try stopping the rumors."  *Id*. . . .  Also included with
        V.V.G.'s correspondence were test reports from a laboratory in Italy of certain unidentified
12       yarns.  *Id*.  According to those test reports, provided to KFI on July 10, 2006, no more than
        6.4% cashmere was found in any of the samples tested.  *Id*.
13

14   Cascade's Motion, Dkt. # 724, p. 5.   Cascade has misquoted the letter as to what was considered "very

15   dangerous." It was not "the absence of cashmere" as asserted, but rather the rumors circulating about

16   that absence (which originated with Cascade).  Regarding the initial test report from Langley that was

17   circulated at the 2006 trade show, showing no cashmere in Cashmerino yarn, the letter from V.V.G.

18   stated,

19           Cascade told us many times that they did not intend to give the information to the market,
        and that they are not happy about what is happened, even more now that they have known
20       that we are the producers of this line, because they have no doubts about our reliability.
        They said that one reps had seen the report (at TNNA?) and talked about other people, so
21       started the rumours.  They have promised us to do all what is possible for stopping this
        matter asap.  We have commented that **these kind of matters are quite dangerous:** if
22       everybody start testing everything on the market, the consequences would be a "big war,"
        and everybody will only get problems; they agreed with our point of view.  In case of need,
23       we are ready to start testing different products, even if we think the best solutions for
        everybody would be to try stopping the rumours.
24

25   _____
       [5] Cascade's counsel Robert Guite also represented plaintiff The Knit With in that litigation until
26   June 9, 2011, when he withdrew.  According to the deposition statements of Robert Dunbabin, Jr.,
     Cascade's in-house counsel, Cascade paid approximately $100,000 toward The Knit With's legal
27   expenses in the Pennsylvania case.  Declaration of Joshua Slavitt, Dkt. # 765, Exhibit 8, pp. 72-76.

28   ORDER - 12

1    Declaration of Robert Guite, Dkt. # 12, Exhibit 11 to Exhibit A (emphasis added).  The letter also

2    explained the results in the attached test reports of unidentified Cashmerino yarns by an Italian

3    laboratory.  The laboratory explained that it is not easy to "separate exactly very similar animal fibres."

4    *Id*.  Therefore the tests reported only what was identified as cashmere with certainty; there was an

5    additional component that was mixed cashmere and wool but which was reported as wool.  *Id*.  Thus

6    according to V.V.G., the laboratory tests validated that the total cashmere was 10%,[6] not the 6.4%

7    specifically identified as cashmere.  *Id*.  Finally, V.V.G. explained that they used a "second level"

8    cashmere in the product, but if that was posing too much risk in the form of non-conforming test results,

9    they could change the blend and use the "best possible" cashmere to achieve better test results.  *Id*.  In

10   short, the letter from V.V.G. does not say what Cascade suggests, and does not in any way constitute

11   evidence that the Cashmerino yarns manufactured by V.V.G. were mislabeled as to the amount of

12   cashmere in the product.

13         Cascade also points to a July 20, 2006 letter from KFI to its customers, asserting that "KFI

14   continued to assert that the Accused Yarns contained cashmere," and arguing that the purpose of the

15   letter was "to counter the allegations that the Debbie Bliss Cashmerino yarns were mislabeled."

16   Cascade's Motion, Dkt. # 724, p. 5.  Cascade neglects to mention that the KFI letter also contained a

17   very plausible explanation for the variable test results, including those tests that find no cashmere in the

18   Cashmerino yarns:

19         [A]s we have repeatedly pointed out to Cascade, it is difficult to test accurately for cashmere

20

21         [6] Cascade has referred repeatedly throughout its memoranda to an allowable 3% variance in
     stated fiber content under applicable federal regulations.  Cascade Motion, Dkt. # 724, pp. 11, 16;
22   Cascade Opposition, Dkt. # 757, pp. 9, 10, 11.  "A 3% variance is the generally acceptable standard for
     variation in natural animal fibers as provided in the applicable regulations promulgated by the FTC."
23   Cascade's Opposition, Dkt. # 757, p. 11.  These are references to regulations promulgated under the
     Textile Fiber Products Identification Act, 16 C.F.R. §303.01 *et seq*., which state that fiber products
24   containing a blend of fibers "shall not be deemed to be misbranded as to fiber content percentages if the
     percentages of weight of any fibers present in the total fiber content of the product, . . . do not deviate or
25   vary from the percentages stated on the label in excess of 3 percent of the total fiber weight of the
     product." 16 C.F.R. § 303.43(a).  By way of illustration, the regulation states that where the label states
26   a certain fiber constitutes 40% of the product, the actual amount may vary from 37% to 43% of the total
     fiber weight.  *Id*.  Thus, this regulation allows for an actual cashmere content of 9% to 15% when the
27   stated amount is 12%.

28   ORDER - 13

content, which can result in "false negative" results—*i.e.*, findings of no cashmere content where cashmere is in fact present.  Specifically, fiber experts we have contacted all state that, when one uses a projection microscope to examine Iranian or Mongolian Cashmere that is blended with extra fine merino wool—both of which have the same micron of approximately 18/19—there will be some fibers that can be identified as wool, some as cashmere and others that are "indeterminate."  This makes the report on which Cascade has irresponsibly relied even more suspect.

Stated simply, it is virtually impossible to differentiate between Iranian cashmere and extra fine merino wool because the two fibers have virtually the same characteristics.  It is therefore not surprising that a lab may mistake cashmere fibers for wool fibers in a particular sample and thereby erroneously conclude that there is no cashmere in the sample.

Declaration of Robert Guite, Dkt. # 12, Exhibit 2 to Exhibit A.   As with the other evidence cited by Cascade, this letter does not in any way constitute evidence that KFI's yarns were mislabeled as to cashmere content.

The Court has reviewed plaintiff's cited evidence at length in order to demonstrate the basis for its finding that Cascade has produced no evidence to support the contention that KFI's yarns were in fact mislabeled as to cashmere content or milk fiber content.  As false labeling of the product is an essential element of each of the four claims asserted by Cascade, all necessarily fail, as set forth in more detail below.

### A.  Counts I and II: Unfair Competition and False Advertising under 15 U.S.C. § 1125(a)

**(1) Plaintiff's Motion for Summary Judgment** (Dkt. # 724)

 Cascade's federal claims of unfair competition and false advertising arise under section 43(a) of the Lanham Act, which states in relevant part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any ... false or misleading representation of fact, which ... (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).  The elements of this claim are: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate

ORDER - 14

1  commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either

2  by direct diversion of sales from itself to defendant or by a lessening of the good will associated with its

3  products. *Southland Sod Farms v. Stover Seed Co*., 108 F. 3d 1134, 1139 (9th Cir. 1997).

4          An advertising claim may be either literally false on its face, or may be literally true but

5  confusing or misleading to consumers. *Id*. As set forth above, plaintiff has produced no evidence that

6  the labels on KFI's cashmere blend and milk fiber yarns were literally false. Cascade's claims of falsity

7  and mislabeling are based on the assumption that the test reports produced by the Langley laboratory

8  were accurate and valid, but the Court has excluded these reports as unreliable under *Daubert*. In so

9  ruling, the Court also noted that "accuracy and reliability of the test results are not an isolated problem

10  with K.D. Langley fiber Services" and that the problem "appears to be industry-wide." Order, Dkt. #

11  865, p. 10. The Court has reviewed the evidence of falsity offered by Cascade, apart from the Langley

12  tests, and has found that nothing therein constitutes actual evidence that the yarns at issue in this case

13  were falsely labeled as alleged in the FAC.

14          In moving for summary judgment, Cascade attempts to shift the burden of proof to defendants,

15  asserting that "[t]here is no evidence that many accused yarns are properly labeled." Cascade Motion,

16  Dkt. # 724, p. 10. However, on summary judgment the burden is on plaintiff to show that there is no

17  genuine dispute as to this material fact (falsity of labels), and that Cascade is therefore entitled to

18  judgment as a matter of law. Fed.R.Civ.P. 56(a). In order to support the assertion that the fact of

19  falsity cannot be genuinely disputed, Cascade must cite to particular parts of the materials in the record

20  which demonstrate that fact. Fed.R.Civ.P. 56(c)(1)(A). Had Cascade cited to such facts in the record,

21  then defendants would have to produce evidence to raise a genuine issue of material fact as to falsity.

22  However, plaintiff has pointed to no facts which would constitute evidence of falsity of the labels,

23  because the fiber tests on which plaintiff's claims are based have been found inadmissible. No inference

24  can arise from defendants' initial acceptance of the Langley fiber tests as genuine. In the absence of

25  evidence of falsity produced by plaintiff, defendants need produce no controverting evidence to defeat

26  plaintiff's summary judgment motion.

27          Instead of producing controverting evidence demonstrating that the labels are correct, defendants

28  ORDER - 15

have argued that Cascade has not demonstrated literal falsity.  KFI Opposition, Dkt. # 744.  KFI argued

that the Langley tests were unreliable, based on the tests performed by its own experts, Reitman and

Varley.  Now that the Court has found the Langley test results inadmissible, it need not address KFI's

additional arguments or find at this time that the Reitman and Varley test results are themselves

admissible.[7]

Plaintiff's theory of Lanham Act liability relies entirely on literal falsity, based on the fiber tests

performed by Langley, which have now been excluded.  Nowhere has plaintiff argued that the labels

were literally true but confusing or misleading to consumers, in order to demonstrate falsity under the

alternative formula set forth in *Southland Sod Farms*.  Although Cascade argues that the labels are

deceptive, that argument is addressed to the second element of a Lanham Act claim, and is based on the

premise that the labels are false and misleading.  As Cascade has failed to demonstrate literal falsity, and

failed to argue that the labels are literally true but misleading, the Lanham Act claims fail at the first

step.

> Once the false statements of fact are identified, the plaintiff must prove that *each* false
> statement of fact was a commercial advertisement or promotion, entered into interstate
> commerce, and was deceptive, material, and injurious. A plaintiff cannot sustain its
> Lanham Act claim by merely throwing mud at the wall and hoping that some of it will
> stick.

*EMove Inc., v. SMD Software Inc*., 2012 WL 1379063 at *7 (D.Ariz.2012) (citing *Southland Sod Farms*,

108 F. 3d at 1139 (citations omitted).   As Cascade has failed to demonstrate literal falsity as to any of

the yarn labels, plaintiff's motion for summary judgment on the Lanham Act claims shall be denied.

**(2) KFI Defendants' Motion for Summary Judgment** (Dkt. # 715)

The KFI defendants (Knitting Fever, Inc. and KFI, Inc., Sion Elalouf, and Designer Yarns, Ltd.)

have moved for summary judgment on several bases.  Defendant's Motion for Summary Judgment, Dkt.

---

[7] Cascade has moved to strike certain declarations offered by defendants which go to the admissibility of the Varley and Reitman test results.  However, for the purposes of this summary judgment motion, the Court has not considered the test results produced by Varley or Reitman as evidence of veracity of the yarn labels.  The motion to strike the declarations of Dubray and Roberts is therefore denied as moot.

ORDER - 16

1   # 715, pp. 4-6.  The KFI defendants assert that Cascade has failed to demonstrate either commercial or

2   competitive injury as required for standing, that the claims of false labeling are pre-empted by the Wool

3   Products Labeling Act, and also that Cascade's claims are barred by the statute of limitations or laches.

4   Cascade has argued in opposition to these contentions.  Cascade's Opposition, Dkt. # 757.   The Court

5   need not reach the questions of standing, preemption or time bar, as KFI has also asserted that Cascade

6   has not established the essential elements of a Lanham Act claim, starting with the first element, falsity.

7   Defendants assert that "Cascade has produced no evidence of a literally false statement."  Defendants'

8   Motion, Dkt. # 715, p. 7.

9          Cascade's response, which was written before its expert was disqualified and the fiber test

10  results held inadmissible, was simply to assert that "Cascade has already established that KFI's yarn

11  labels are literally and unambiguously false, and neither KFI's clever word games nor its reliance on

12  inapposite law change[s] that fact." Cascade's Opposition, Dkt. # 757, p. 8; citing to Cascade's Motion

13  for Summary Judgment, Dtk. # 724.  The bulk of the Cascade's arguments on falsity have been rendered

14  moot by the Court's ruling on the inadmissibility of the Langley test results.  Cascade also asserts that it

15  has evidence of falsity of at least the Cashmerino yarns apart from the fiber tests, in the form of

16  communications between KFI and the manufacturer.  Cascade states that "correspondence between KFI

17  and its manufacturer confirms that KFI labeled its Cashmerino products as containing 12% cashmere

18  when it knew that the manufacturer was only even purporting to put in (at most) 10% "cashmere" into

19  the product." Cascade's Opposition, Dkt. # 757, p. 9 n. 7.  Cascade then cites to several pages of

20  deposition of Sion Elalouf, together with two exhibits about which he was asked to testify.  Declaration

21  of Robert Guite, Dkt. # 706, Exhibit A, Exhibits 22, 23.  The exhibits are two copies of  emails from the

22  Italian manufacturer, V.V.G. Filatura, to Mr. Elalouf.  They differ slightly, and that difference was the

23  subject of the deposition questioning, with Cascade's attorney suggesting that Mr. Elalouf altered some

24  of the fiber percentage figures before forwarding the email.  *Id*., Exhibit A, pp. 239-252.  The Court

25  cannot make any determination as to that accusation, as it would involve expert testimony regarding the

26  authenticity and transmission of the messages.  Neither has the Court been asked to do so.  What is

27  significant about the emails, for the purposes of this motion, is that the unaltered portion states that to

28   ORDER - 17

1   make the Cashmerino blend, V.V.G. puts in three components as follows: "Tops 100% acrylic

2   microfibre," put in at 35%; "Tops 100% Merino wool extrafine," put in at 45%, and "Tops pre-mixed

3   55% cashmere 45% wool," put in at 20%.  Dkt. # 761, Exhibit A part 2, Exhibit SE 22.  The result,

4   according to V.V.G's representative, is "teoretically [sic] 11% to 12% on the final blend." *Id.*   That is

5   not the "(at most) 10% cashmere" asserted by Cascade above, and the document does not constitute

6   evidence that KFI knew that the manufacturer was putting in less cashmere than stated on the

7   Cashmerino label.

8          A party is entitled to summary judgment if it shows that the adverse party cannot produce

9   admissible evidence to support a fact essential to that party's claim.  Fed.R.Civ.P. 56(c)(1)(B).

10  Defendants have argued that Cascade has no admissible evidence in support of its claim of literal falsity

11  under the Lanham Act.  The Court has determined that is the case.  Accordingly, the KFI' defendants'

12  motion for summary judgment shall be granted, and Cascade's Lanham Act claims shall be dismissed.

13         **(3) Individual Defendants' Motion for Summary Judgment** (Dkt. # 717)

14         Individual defendants Debbie Bliss and Jay Opperman have moved for summary judgment on all

15  claims asserted against them.  Dkt. # 717.  As to the Lanham Act claims, they both contend that Cascade

16  has no standing to assert such claims against them, as they are not competitors of Cascade.  In the

17  motion, Ms. Bliss, a resident of the UK,  asserts that she is a designer of knitting patterns whose name

18  appears on the Cashmerino line of yarns, but while she promotes the yarns she does not actually sell

19  them. She licences her name to Designer Yarns, Inc., who pays her royalties based on sales.  KFI

20  distributes her brand of yarns in the United States, but she receives neither salary nor commission from

21  KFI.  Motion for Summary Judgment, Dkt. # 717, pp. 3-4.

22         Mr. Opperman, for his part, is an independent sales representative for KFI.  He is not an

23  employee of KFI  but receives commissions based on his sales of Knitting Fever, Inc. yarns to yarn

24  shops.  He attends trade shows and calls on yarn shops, but does not participate in any aspect of labeling

25  the yarn.  *Id.*, p. 4-5.

26         In order to have standing to assert a Lanham Act false advertising claim against a defendant, a

27  plaintiff must demonstrate (1) a commercial injury due to a misrepresentation about a product; and (2)

28  ORDER - 18

that the injury is competitive, meaning that it is harmful to the plaintiff's ability to compete with the

defendant. *Jack Russell Terrier Network of Northern California v. American Kennel Club, Inc.,* 407 F.

3d 1027, 1037 (9th Cir.2005).  Ms. Bliss and Mr. Opperman both assert that Cascade cannot show either

element, as they have not misrepresented any product (element one), and they do not compete in any

way with Cascade.

> In opposition to the motion, Cascade argues that
>
> Bliss and Opperman became aware [in 2006] that the Accused Yarns were potentially
> mislabeled.  Despite this knowledge, and without a factual basis, Bliss sent a letter during
> the fall of that year to her customers, reassuring them that her yarns contained cashmere
> and that "state of the art" tests were being performed.  Similarly, Opperman continued to
> sell the Accused Yarns, issuing guarantees and making oral assurances to customers
> regarding fiber content.  Even when faced with mounting evidence of mislabeling, Bliss
> and Opperman said nothing to KFI's customers or to the general public.  Instead, they
> affirmatively and, by their silence, continued representing that the yarn was properly labeled.
> They did nothing to change the labeling.  They even actively worked together to conceal
> the negative test results from the public by evasively claiming that **some cashmere** is present
> in the yarns—a demonstrably false contention, at least with respect to certain yarns.
> Correspondence between Bliss and Opperman confirmed that the yarns contained at most
> 5% cashmere, nowhere near the labeled amount.  Ms. Bliss originally advocated relabeling
> the yarns' that never happened and she continued to sell and promote her branded
> mislabeled goods.  So did Mr. Opperman.

Cascade's Opposition, Dkt. # 748, p. 2.

The Court need not review the evidence cited by Cascade in support of this argument, as it is all

premised on the assumption that the Debbie Bliss yarn was in fact mislabeled.  However, as set forth

above, Cascade has offered no admissible evidence that this in fact is the case.  The fiber tests have been

excluded, and Cascade may not point to correspondence between defendants regarding those unreliable

test results as confirming that the yarn "contained at most 5% cashmere."   Thus there is no basis for

Cascade's claim that in its own summary judgment motion (which has now been denied) it has "set forth

uncontroverted evidence establishing each element of its Lanham Act claim. . . ."   Cascade's

Opposition, Dkt. # 748, p. 7.  Moreover, Cascade may not assert that Ms. Bliss and Mr. Opperman have

contributory liability for false labeling when there is no admissible proof that any labels were false.

As Cascade has failed to point to a genuine issue of fact as to a false statement by either Ms.

Bliss or Mr. Opperman, or their status as competitors subject to Lanham Act liability, their motion for

ORDER - 19

1   summary judgment shall be granted, and the Lanham Act claims against them dismissed.

2          The Court notes that defendants' reply on this motion contains a motion to strike portions of the

3   Declaration of James Casale, filed by Cascade at Dkt. # 750.  Defendants contend that the declaration

4   constitutes a sham affidavit, as it contradicts earlier deposition testimony.  The Court has reviewed the

5   contested portion of the declaration in ¶ 2, together with the cited portions of Mr. Casale's deposition,

6   and finds that the declaration does not constitute a sham affidavit.  In the declaration, Mr. Casale states,

7
8          Mr. Opperman disclosed he had an ownership interest in the company formed to distribute the
           Debbie Bliss branded yarns and stated that he was responsible for the marketing of the Debbie
           Bliss yarns (including the Cashmerino yarns) from the "label up including the shadebook for
9          the Debbie Bliss collection.

10  Dkt. # 750, ¶ 2.  In his earlier deposition, which was taken in the Pennsylvania *The Knit With v. Knitting*

11  *Fever* case, he testified,

12         Mr. Opperman says he was given a piece of Designer Yarns from Mr. Elalouf.  Mr. Opperman
           says Mr. Elalouf is responsible for choosing the yarns and the fiber content of those yarns.  I,
13         Jay Opperman, am responsible for the marketing materials of Designer Yarns' products.

14  Declaration of Joshua Slavitt, Dkt. # 765, Exhibit 7, p. 329.  The Court sees no contradiction between

15  these two statement; both assert that Mr. Opperman has an ownership interest in Designer Yarns (he was

16  "given a piece of" it by Mr. Elalouf), and that he is responsible for marketing, while Mr. Elalouf is

17  responsible for choosing the yarns and fiber content.  While this may all be hearsay, it is not a sham and

18  the Court shall deny the motion to strike as to ¶ 2 of Mr. Casale's declaration.  The motion to strike is

19  granted as to ¶¶ 3 and 4, which, according to defendants, misrepresent the actual language of the

20  pleadings filed in the Pennsylvania case.

21         **B.  Count II and IV: State Law Claims of Unfair Competition in Violation of the**
           **Washington Consumer Protection Act, RCW 19.86, and Common Law Unfair Competition**

22

23         (1) **Cascade's Motion for Summary Judgment** (Dkt. # 724)

24         Plaintiff has also moved for summary judgment on the two state law claims of unfair competition

25  in violation of the Washington Consumer Protection Act ("CPA"), RCW 19.86, and unfair competition

26  at common law.  Plaintiff contends that the CPA is analogous to the Lanham Act, so that when a

27  defendant is found liable under the Lanham Act, it is also liable under the CPA.  Cascade's Motion, Dkt.

28  ORDER - 20

1    # 724, p. 22; citing *Sleep Country USA, Inc., v. Northwest Pac., Inc.*, 2003 U.S. dist. LEXIS 26055 at *

2    20 (W.D.Wash., Oct. 10 2003).[8]  Cascade contends that it "has established that it has satisfied the

3    elements of its Lanham Act claim and, simultaneously its CPA claim." *Id*. at 22, citing to *Cashmere &*

4    *Camel Hair Manufacturers Institute v. Saks 5th Avenue*, 284 F. 3d 302, 320 (1st Cir. 2002), and

5    representing the result as "reversing the dismissal of plaintiff's state law unfair competition claims as

6    the conduct supporting the Lanham Act claim also supported the state law claim." *Id*.  Thus, under the

7    very case cited by Cascade, failure to support a Lanham Act claim should lead to automatic failure of

8    the state law claims of unfair competition, both statutory under the CPA and at common law.

9    Nevertheless, the Court will turn to address the actual elements of a CPA claim.

10        It is well-established under Washington law that a CPA violation must include the following

11   elements: (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) affecting the

12   public interest; (4) that injures the plaintiff in his or her business or property; and (5) a causal link

13   between the unfair or deceptive act and the injury suffered.  *Hangman Ridge Training Stables, Inc. v.*

14   *Safeco Title Ins. Co.*, 105 Wn.2d 778 (1986).   The "unfair or deceptive act or practice" must have the

15   capacity to deceive a substantial portion of the public.  *Henery v. Robinson*, 67 Wash. App. 277, 289-91

16   (1992).

17        Under the analysis set forth above, the Court finds that Cascade has provided no evidence of a

18   deceptive act or practice by the KFI defendants with respect to the labeling of yarn.  Nor has Cascade

19   demonstrated that it has met the requirements for an action for a state law claim of unfair competition at

20   common law.  *Camel Hair Manufacturers Institute v. Saks 5th Avenue*, 284 F. 3d at 320 (finding that the

21   same conduct supports a Lanham Act claim and a state law claim of unfair competition).   Accordingly,

22   Cascade's motion for summary judgment on the state law claims shall be denied.

23   

24        [8] Cascade asserts in its opposition to the KFI defendants' own motion for summary judgment on
     the CPA claim that the converse is not true.  Cascade's opposition, Dkt. # 757, p. 7 n. 5.  Cascade cites
25   no legal authority whatsoever for this statement.  This Court has previously found that claims under the
     CPA and for common law unfair competition are "substantially congruous" with Lanham Act unfair
26   competition claims.  *Campagnolo S.R.L. v. Full Speed Ahead, Inc*., 2010 U.S. Dist.LEXIS 46176 AT
     *32 (W.D.Wash. May 11, 2010). There is no basis for applying that congruity in one direction and not in
27   the other, at least in the context presented here.

28    ORDER - 21

(2) **KFI Defendants' Motion for Summary Judgment on State Law Claims** (Dkt. # 715)

Defendants have moved for summary judgment on the state law claims on the basis that they are based on the same conduct as the Lanham Act claims and substantially congruous with those claims. Defendants have also moved on the basis these claims are time-barred. As noted above, Cascade has opposed the motion by arguing that

> KFI bafflingly asserts that if it disproves any element of Cascade's Lanham Act claim, it is equally entitled to judgment in its favor on Cascade's CPA and common law unfair competition claims. While the **converse** proposition is accurate, KFI's statement is not. CPA and common law unfair competition claims require Cascade to prove entirely different elements and potentially apply to prohibit a broader (not congruous or narrower) range of activities.

Cascade's Opposition, Dkt. # 757, p. 7 n. 5 (emphasis in original). Cascade cites no legal authority for this statement.

Cascade argued in its own motion for summary judgment that it simultaneously satisfied the elements of its Lanham Act claim its CPA claim. Cascade's Motion, Dkt. # 724, p. 22. It also asserted that because it had already established each element of its Lanham Act claim, it is entitled to summary judgment "as to liability for its common law unfair competition claim." *Id.*, p. 23. In ruling on Cascade's motion, the Court has found that Cascade has not satisfied the first element of a Lanham Act claim, namely a literally false statement, and therefore has not satisfied the first element of a CPA claim, namely a deceptive act or practice. Cascade's unsupported "bafflement" argument fails to demonstrate why this ruling is not dispositive of the CPA and unfair competition claims. As to each claim asserted, Cascade's proof fails at the first step,[9] because it has no evidence of a false statement or mislabeling of the yarn. The conclusion that the Lanham Act, CPA, and unfair competition claims are sufficiently congruous that failure of proof as to the element of falsity or deception applies with equal force to defeat Cascade's claims under all three is supported by both *Campagnolo S.R.L.* and Cascade's cited

---

[9] Cascade sets forth the elements of its common law unfair competition claim as requiring it to show that "KFI (1) in the marketing of goods or services, (2) made a representation relating to its goods (3) that is likely to deceive or mislead prospective purchasers (4) to the likely commercial detriment of Cascade." Cascade's Motion, Dkt. # 724, p. 22. Under this statement of the elements, it would be a step (3) that Cascade's claim fails.

ORDER - 22

1    case of *Camel Hair Manufacturers Institute v. Saks 5th Avenue*, 284 F. 3d at 320.  Defendants' motion

2    for summary judgment on the state law claims shall accordingly be granted and the claims dismissed.

3    There is an additional basis for dismissal of Cascade's state law unfair competition claim, in that

4    it was filed outside the three-year statute of limitations applicable to claims of fraud.  RCW 4.16.080(4).

5    Defendants asserted a time-bar argument in its motion with respect to all claims, arguing that while the

6    Lanham Act itself contains no statute of limitations, courts "borrow" the analogous state law statutory

7    period.  KFI Defendants' Motion for Summary Judgment, Dkt. # 715, p. 20.  Defendants contend that

8    the most analogous state law for Lanham Act claims is common law fraud, citing *Ranch Realty, Inc., v.*

9    *DC Ranch Realty, LLC*, 614 F. Supp. 2d 983, 989 (D.Ariz. 2007).  Cascade counters with the assertion

10   that the state law cause of action most similar to the Lanham Act is the Washington CPA, which has a

11   four-year statute of limitations.  Cascade also argues that any delay in filing should be analyzed under

12   laches principles, not statute of limitations.  Cascade's Opposition, Dkt. # 757, pp. 10-20.

13   The Court declines to resolve the question of the applicable statute of limitations for Lanham Act

14   claims, as those claims were resolved on substantive grounds, for Cascade's lack of evidence of fraud.

15   However, Cascade offers no convincing argument that its state law claim of unfair competition is not

16   barred by the three-year statute of limitations applicable to fraud claims.  According to the allegations of

17   the complaint, Cascade knew of the alleged mislabeling, at the latest,[10] on May 26, 2006 , when it

18   received the first Langley test report.  FAC, Dkt. # 322, ¶ 41.  This case was filed May 24, 2010, just

19   two days before a four-year statute of limitations would expire, and well beyond the limitations period

20   for the fraud/unfair competition claim.  Accordingly the claim shall be dismissed on that basis as well.

21   **(3) Individual Defendants' Motion for Summary Judgment on State law Claims** (Dkt. #717)

22   Individual defendants Debbie Bliss and Jay Opperman have moved for summary judgment on

23   the state law claims on the same basis asserted by the KFI defendants; namely, that they are based on the

24   same alleged conduct as the Lanham Act claims, and that congruity should lead to the same result.  The

25

26   [10] The complaint also alleges that Mr. Elalouf "discovered" the "0%" cashmere Cashmerino in 2000 or 2001, and introduced it into the U.S. yarn market under the Debbie Bliss label in 2001.  FAC,

27   Dkt. # 322, ¶¶ 28, 33-39.  It is possible that additional discovery would have produced evidence that Cascade could have alleged false labeling much earlier than May of 2006.

28   ORDER - 23

1  Court agrees and shall grant the motion for summary judgment for the reasons set forth in section B(2)

2  above.

3

4                                        CONCLUSION

5       As set forth herein, Cascades's motion for summary judgment against all defendants on Counts I

6  through IV of the Fourth Amended Complaint (Dkt. # 724) is DENIED in all respects.  The KFI

7  defendants' motion for summary judgment on Counts I through IV (Dkt. # 715) is GRANTED, and

8  these claims against the KFI defendants, Sion Elalouf, and Designer Yarns, Inc., are DISMISSED.  The

9  summary judgment motion filed by Debbie Bliss and Jay Opperman as to all claims against them (Dkt. #

10 717) is also GRANTED and these claims are DISMISSED.

11      The Court has declined to rule on several of the motions to strike presented by the parties in their

12 memoranda, as such ruling was not necessary to the issues presented in the motions.  Any remaining

13 motions to strike are hereby STRICKEN as moot.

14      Plaintiff's claims against defendant Emmepieffe S.R.L. remain pending, as do all counterclaims

15 between the KFI defendants, Cascade, and the third-party (Dunbabin) defendants.  The Court will

16 address the pending motions for summary judgment on the counterclaims in a separate Order.  As

17 between Cascade and Emmepieffe, no summary judgment motion has been timely filed.  The pretrial

18 conference has been re-scheduled to November 2, 2012 at 9:00 am.  Counsel for all parties shall attend.

19

20      Dated this 29 day of October 2012.

21

22

23

24 RICARDO S. MARTINEZ
   UNITED STATES DISTRICT JUDGE

25

26

27

28  ORDER - 24