1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8    CASCADE YARNS, INC.,

9                    Plaintiff/Counterclaim
                     Defendant,

10        v.

11   KNITTING FEVER, INC., et al.,

12                   Defendants/Counterclaim
                     Plaintiffs/Third-Party
13                   Plaintiffs,

14        v.

15   ROBERT DUNBABIN, SR., et al.,

16                    Third-Party Defendants.

17   CASCADE YARNS, INC.,

18                   Plaintiff,

19        v.

20   EMMEPIEFFE S.R.L., a foreign limited liability
     corporation,
21
                     Defendant.
22

CASE NO. C10-861RSM

ORDER ON MOTION FOR RELIEF
FROM DEADLINES

23

24        This matter is before the Court for consideration of a motion by plaintiff Cascade Yarns, Inc.

25   ("Cascade") for relief from deadlines. Dkt. # 883. Cascade requests relief from the discovery cutoff

26   date and leave to conduct depositions, relief from and a continuance of the trial date, and relief from the

27   deadline to bring a motion for reconsideration of the Court's October 18, 2012 Order on Motion to

28    ORDER - 1

1  Exclude Expert Reports and Testimony of Kenneth D. Langley, Dkt. # 865.  Defendants have opposed

2  the motion.

3        As to the motion to continue the trial date, the motion is moot, as the November 5, 2012 trial

4  date has been stricken.  Order, Dkt. # 892.  As to the remaining relief requested, the Court finds, after

5  consideration of the parties' memoranda, the balance of the file, and related materials which are subject

6  to judicial notice, that plaintiff has not demonstrated a right to such relief.  The motion shall accordingly

7  be denied.

8                                    DISCUSSION

9        The Order which plaintiff seeks to challenge excluded the testimony and reports of plaintiff's

10  expert on fiber testing, Kenneth D. Langley.  The Court found that Professor Langley's fiber test results

11  were not reliable and excluded them pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509

12  U.S. 579 (1993).   The ruling was based in large part upon Professor Langley's performance in "round

13  trials" conducted by the Cashmere and Camel Hair Manufacturer's Institute ("CCMI"), a trade

14  organization.  These are trials in which laboratories which do qualitative and/or quantitative analysis of

15  fine animal fibers are tested in their accuracy.  Defendants submitted with their motion to exclude the

16  expert the records of his performance in the round trials for the years 2005, 2007, 2008, 2009-10, and

17  2011.  The results are set forth in the Court's Order.  Dkt. # 865, pp. 8-9.  Briefly stated, Professor

18  Langley's performance was abysmal.  In every single test of a blended yarn (one containing more than

19  one type of fine animal hair), Professor Langley's test results were off, often by a significant factor.  For

20  example, in 2005, in a sample which contained a 50-50 blend of wool and cashmere, Professor Langley

21  identified only 32% of the fiber as cashmere.  In 2007, in a sample which contained 80% cashmere and

22  20% yak, Professor langley found only 2.2% cashmere.  In a 50-50 blend of cashmere and dyed yak, he

23  found only 4.8% cashmere.  In the 2009-10 trial, Professor Langley found no cashmere at all in a sample

24  which contained 65% wool and 35% cashmere.  *Id.*

25        It is not only Professor Langley who struggles with accuracy in identifying blends of animal hair.

26  Defendants also submitted the results obtained by forty different anonymous testing laboratories in the

27  2007 round trials.  The Court noted that of the 200 fiber tests reported (40 laboratories x 5 tests per lab),

28   ORDER - 2

1   only 29 were accurate within the three percentage points allowed under industry standards.  *Id*., p. 10.

2   Thus, the Court concluded, the accuracy and reliability of fiber tests of fine animal fibers are not an

3   isolated problem, but appear to be industry-wide.  After this Order was filed, defendants withdrew their

4   own expert on fiber testing, Adam Varley.

5       Cascade seeks to re-open discovery so that it may obtain evidence to support a motion for

6   reconsideration of the Court's Order excluding Professor Langley's expert report and testimony.

7   Specifically, Cascade seeks an opportunity to obtain testimony from CCMI and/or another trade

8   organization, the American Association of Textile Chemists and Colorists ("AATCC") regarding the

9   general reliability of fiber analysis, the reliability of specific AATCC testing protocols, and "the reasons

10  for, performance on and bias in the round trials."  Cascade's Motion, Dkt. # 883, p. 3.  After obtaining

11  this information, Cascade proposes to use it to support a motion for reconsideration of the Court's

12  Order.  Such motion was due November 1, 2012, so Cascade also seeks relief from that deadline.  Local

13  Rule CR 7(h)(2).

14      Motions for reconsideration are disfavored and will be denied in the absence of "a showing of

15  manifest error in the prior ruling or a showing of new facts or legal authority which could not have been

16  brought to its attention earlier. . . ."  Local Rule CR 7(h)(1).  Cascade attempts to meet this standard by

17  asserting that this is evidence it "could not have obtained through reasonable diligence. . ."  Cascade

18  Motion, Dkt. # 883, p. 3.  Cascade states,

19          Cascade earlier sought information from CCMI by subpoena for documents in the District
            of Massachusetts.  CCMI objected to the subpoena and the magistrate judge declined to
20          enforce the subpoena.  Declaration of Robert J. Guite ("Guite Decl."), Ex. A.  Cascade
            objected to the report and recommendation.  The district judge has not yet ruled on that
21          motion.  *Id*.  Thus, Cascade has been diligent in seeking discovery from non-party CCMI.

22  Cascade Motion, Dkt. # 883, p. 3 n. 2.

23      Cascade's "diligence" argument implies that what was sought, and denied, in the Massachusetts

24  proceedings was information from CCMI regarding the round trials and reliability of  AATCC testing

25  protocols.  Cascade would have to make that specific showing for its diligence argument to meet the

26  standard for motions for reconsideration.  However, Cascade has not presented evidence, such as a copy

27

28   ORDER - 3

of the subpoena, to demonstrate this.  Exhibit A to the Declaration of Robert Guite is simply the docket

sheet from the proceedings in the District of Massachusetts to enforce Cascade's subpoena to CCMI. On

that docket, an electronic order with no docket number, states the Magistrate Judge's ruling on

Cascade's motion to compel enforcement of the subpoena: "ELECTRONIC ORDER entered denying

Motion to Compel for seasons set forth in the opposition of Cashmere and Camel Manufacturers

Institute, a non-party to the underlying litigation."  Declaration of Robert J. Guite, Dkt. # 884, Exhibit

A.

　　　　　This Court may take judicial notice of the record of the Massachusetts district court, and the

documents filed in the case.  The Court has reviewed Cascade's subpoena to CCMI, the motion to

compel, CCMI's opposition, and the transcript of the hearing.  *Cascade Yarns, Inc., v. Knitting Fever*,

*Inc*., Cause No. 1:11-mc-91332-NMG, United States District Court for the District of Massachusetts,

Dkt. ## 1, 2, 4, 7.   The Court finds that Cascade did not request any documents relating to the CCMI

round trials or the reliability or accuracy of the AATCC testing protocols.  What was requested of CCMI

in the subpoena were  two categories of documents: (1) "all correspondence with the following or agent

thereof," listing defendants Knitting Fever, Sion Elalouf, Filatura Pettanatta VVG, and Jay Opperman,

together with counsel, and (2) "all documents related to yarn distributed by Knitting Fever, Inc., such as

request[s] for fiber testing or results of such a test," then listing twelve Knitting Fever yarns.  *Id*., Dkt. #

1, Exhibit A.  It appears from the transcript of the hearing on Cascade's motion that the main documents

sought were fiber tests on Knitting Fever's yarns, which were conducted on samples sent to CCMI for

free testing by third parties (mainly yarn shops), pursuant to a program offered by CCMI to members

and retailers in the industry.  *Id*., Dkt. # 7, pp. 6-7, 9, 12-13.  The fiber samples sent in by the members

and retailers were forwarded by CCMI to Professor Langley for the free testing.  *Id*., p. 14.

　　　　　CCMI objected to the production on grounds that the third parties were promised confidentiality

in the testing, and that the test results were in any case of limited probative value in the underlying case

(this case).  At the hearing, CCMI expanded on these arguments, contending that Cascade was trying to

"use the good auspices and good reputation of CCMI as an expert to add credence and credibility to its

own claims, not just in court, but on the internet."  *Id*., p. 12.  CCMI noted that the purpose behind the

ORDER - 4

program would be undermined if Cascade were allowed discovery of these confidential tests.

> They put a fair amount of work into the program. The intent, after considerable experience with litigation, was to say look, let's try to inform the industry. Let them do the testing. Let them send tests in and we'll do preliminary scans, and make it free. It isn't free to us, it's expensive. It involves some publicity. It's a pretty well-established program. If it ever gets out that people who submit free tests can be subject to having their identities disclosed in litigation, and they'll certainly be subpoenaed. I know something about the burdens plaintiff will face in proving in litigation mislabeling. The defenses will be chain of custody and everything else. They're going to have to subpoena the people whose names that we disclose if we do that.
>
> I didn't want to do that, and I didn't think the institute wanted to do that and they didn't want to do it either. That isn't what those people bargained for. They're mostly small retailers. I'm authorized to say it isn't Knitting Fever that submitted any of these things. I'm getting ahead of myself, they've argued that Knitting Fever has routed its testing through CCMI. We don't have any requests from Knitting Fever. One from Cascade Yarns. Everything else is from third-party retailers, mostly small, and they're in 10 different states.
>
> . . . .
>
> The fact is that what is attempting to be done is something that the Rule 45 amendments were intended to prevent, which is drag CCMI into a case that it isn't a part of and try to effectively make it the expert.

*Id.*, p. 12-13.

> With respect to the limited probative value of the tests, CCMI argued,

> Now, the other part of the second point is that the evidence, the underlying evidence, is of limited probative value anyway because they're only preliminary scans, and what preliminary scans are is that the expert, Mr. Langley, takes a look at 4 or 500 fibers. That won't even get admitted. I know something about that. The ASTM standard is rigorous examination of 2,000 randomly-selected fibers . . . . to show definitively. So the test results are not probative sufficiently to meet a Federal Court evidentiary standard, but they could be used for some other purpose I don't know.

*Id.*, p. 14.

As noted above, the Magistrate Judge denied Cascades's motion to compel for the reasons advanced by CCMI, namely the confidentiality of the testing, and the limited evidentiary value of the tests. There was nothing presented or argued regarding the CCMI round trials or the accuracy or reliability of AATCC testing protocols. Thus, Cascade has failed to demonstrate that it could not have sought and obtained such information earlier. Indeed, as defendant has pointed out, the results of

ORDER - 5

Professor Langley's round trials were in his possession the whole time; Cascade could have obtained them from its own expert. The "diligence" argument is thus disingenuous as to the Langley round trials.

The current underlying Cascade's argument in this motion is that it was totally surprised by the Court's ruling on the lack of reliability of its expert. However, the position taken by CCMI at the hearing, that the tests performed by Professor Langley as part of the free testing program were only preliminary scans of no evidentiary value, should have put Cascade on notice as of the date of the hearing, February 2, 2012, that it needed to conduct further discovery in that area.

In its reply, Cascade challenges the use of CCMI's round trials as a measure of its expert's reliability in fiber testing.

> Cascade has been advised and understands that the round trials are not considered to be indicative of unreliability in the area science or of any particular analyst, in part because they do not test textiles actually manufactured and distributed within the industry (and thus, cannot accurately reflect the reliability of fiber content testing of such textiles). Guite Decl., Ex,. F (noting the "atypical" and chemically and/or physically "altered" nature of many of the fiber samples used in the round trials).

Cascade's Reply, Dkt. # 895, p. 5. Exhibit F is described in counsel's declaration as a copy of "a letter from Robert B. Swierupski, director of the National Commodity Specialist Division, to Karl Spillhaus, President of CCMI. Although not described as such, it appears from the address of the website from which the letter was obtained that it is a letter ruling by Customs and Border Patrol ("CBP") on the required labeling for country of origin, and applicable duty, for a test kit containing forty-eight samples of various animal fibers. Declaration of Robert Guite, Dkt. # 896, Exhibit F. The letter states that

> [t]he kit is designed to be used by textile testing laboratories and similar organizations "to promote improved techniques for identifying cashmere and other luxury animal hair." You state that the samples will be used by a technician as standards in fiber identification; the kit contains both typical and atypical fibers of certain species. Using a microscope and other tools, the technician can compare other fibers to the standard fibers in the kit.

*Id.*, p. 1. There is nothing whatsoever in the language of the letter that indicates that these test kits are used in the CCMI round trials; instead they are described as samples intended as standards of various fibers, to be used by technicians for comparison and training purposes. The fact that each vial is described as containing a single type of animal hair, such as "Cashmere Chinese Alashan Type White"

ORDER - 6

"Goat Fiber Mongolian Brown," and "Wool Australian Treated Merino" compels the conclusion that these are not samples intended for use in the round trials, which as noted above mainly contain samples of blended animal hair.  The Court accordingly rejects Cascade's assertion that this evidence proves that the round trial samples are "atypical," or that it provides a basis for giving Cascade leave to conduct additional discovery "to provide the necessary context" for the round trials.  Cascade's Reply, Dkt. # 895, p. 5.

Finally, in its attempt to challenge the Court's ruling on its expert, Cascade has made incorrect statements with respect to the scope of that ruling.  Cascade in its motion lists various government agencies and organizations which "recognize AATCC 20A as the standard for qualitative fiber analysis," and states that in light of this "broad acceptance, Cascade did not reasonably anticipate that is [sic] Court would conclude that AATCC test methods 20 and 20A would be determined to be unreliable. . . ."  Cascade's Motion, Dkt. # 883, p. 6.  Cascade predicts dire consequences that will follow this Court's "evisceration" of consumer protection regulations.   In its reply, Cascade again asserts that the "FTC, United States Customs, and United States Homeland Security all rely upon and approve the use of the AATCC protocols that this Court has now deemed "unreliable" based solely on the results of the round trials. . . ."  Cascade's Reply, Dkt. # 895, p. 5.  The Court *sua sponte* STRIKES this language as misrepresenting the Court's Order filed at Dkt. # 865.

The Court's ruling on lack of reliability in fiber testing was strictly limited to Professor Langley's tests. Any more generalized comments regarding an industry-wide lack of reliability in testing refer **only** to quantitative analysis of blends of fine animal hair (cashmere, yak, merino wool, angora goat, and others).  The Court did not address or in any way implicate or question the reliability of the AATCC 20A quantitative analysis protocols for other fibers and blends, such as synthetic fibers of all kinds, cotton, silk and /or linen.  As described below, these may be analyzed by chemical or mechanical means, and do not require the more subjective visual identification of individual fibers under a microscope.  Thus the reports and other materials presented by Cascade, demonstrating that the AATCC tests are deemed reliable by the agencies named in its motion, are irrelevant.  The vast majority of these documents relate to chemical tests and tests of blends of natural and synthetic fibers, which are not at

ORDER - 7

1    issue here.  Declaration of Robert Guite, Dkt. # 896, Exhibits B, D, E, G, H.

2            The AATCC Test Method 20A-2011 itself differentiates between quantitative analysis methods

3    for fibers which are susceptible to analysis by chemical or mechanical means, and those which are not.

4    The latter fibers, including hair and wool, must be analyzed by microscopical examination, and

5    according to AATCC 20A such analysis is dependent upon the expertise of the analyst, as well as strict

6    adherence to the procedure:

7            The microscopical procedures for fiber composition are applicable to all fibers and their
             accuracy depends to a considerable extent upon the ability of the analyst to identify the
8            individual fibers present.  However, owing to the tedious nature of this technique, its
             use is generally limited to those mixtures which cannot be separated mechanically or
9            chemically; e.g., mixtures of hair and wool and mixtures of cotton, linen, hemp, and/or
             ramie.
10

11   Declaration of Joshua Slavitt, Dkt. # 739, Exhibit 2:  AATCC Test Method 20A-2011, ¶ 2.5.  The

12   microscopical analysis procedure described in this test method requires the preparation of a slide with

13   the fibers, and then, using a microscope with crosshairs, identifying and counting "all fibers passing

14   through the center of the crosshairs."  *Id*., ¶ 14.2.1.  The slide is moved both vertically and horizontally

15   to count the fibers.  "The combined horizontal and vertical counts should total at least 1000 fibers."  *Id*.

16           In language that the Court omitted from the recitation above for the purpose of clarity, Cascade

17   asserts that it "did not reasonably anticipate that [th]is Court would conclude . . . that Professor

18   Langley's testimony would be excluded."  Cascade's Motion, Dkt. # 883, p. 6.  As the Court has noted

19   above, Cascade was put on notice on  February 2, 2012, that CCMI regarded Professor Langley's

20   "preliminary scans" as inadmissible in a court of law.  There were five months of discovery remaining at

21   that time.  Moreover, defendant has in opposing this motion pointed to evidence in the record, dated July

22   26, 2010, shortly after this case was filed, indicating problems with the accuracy of light microscopy

23   tests for cashmere content and specifically with the CCMI round testing program which was designed to

24   correct such problems.  Declaration of Joshua Slavitt, Dkt. # 38, Exhibits 1, 2.  Exhibit I is a journal

25   article by Professor F. J. Wortmann stating unequivocally that "for wool/mohair and wool/cashmere

26   mixtures, extensive round trials have shown that analyzing these blends by light microscopy is

27

28    ORDER - 8

1  unreliable, if not impossible." *Id*., Exhibit 1.  Exhibit 2 is a webshot of the CCMI website with a talk

2  given in Italy on January 19, 2007, addressing the 2005 round trials and the variability of the results.

3  *Id.*, Exhibit 2.  The speaker predicted that "major technological breakthroughs, " including DNA testing

4  and scanning electron microscopy, would result in greater accuracy in the identification and

5  quantification of animal fibers.  *Id*.  However, no evidence has been presented to the Court to indicate

6  that Cascade's expert took advantage of these technological breakthroughs to improve the reliability of

7  the tests he conducted on defendant's yarns.

8      Cascade has demonstrated no grounds to justify re-opening discovery in this matter, nor any

9  basis for the Court to extend time for the filing of a motion for reconsideration.  The motion for relief

10  from deadlines (Dkt. # 883) is accordingly DENIED.

11      The Court GRANTS IN PART defendants' motion to strike raised in the surreply.  Dkt. # 898.

12  Cascade's "pound of flesh" assertion, set forth at n. 8 of its reply, is STRICKEN, along with the

13  reference to "devastating impacts on the industry and the government agencies" for the reasons given

14  above.  This argument misrepresents the scope of the Court's ruling on the reliability of fiber testing.

15      Dated this 14th day of November 2012.

16

17

18      _____

19      RICARDO S. MARTINEZ
        UNITED STATES DISTRICT JUDGE

20

21

22

23

24

25

26

27

28  ORDER - 9